**S. John BYINGTON, et al.**

v.

**VEGA BIOTECHNOLOGIES, INC.**

Civ. No. JFM–93–2989.

United States District Court,
D. Maryland.

Nov. 17, 1994.

Read K. McCaffrey, Patton, Boggs and Blow, Baltimore, MD, for plaintiffs.

Philip M. Andrews, Kevin F. Arthur, Kramon and Graham, Baltimore, MD, for defendants.

MEMORANDUM

MOTZ, District Judge.

Plaintiffs, S. John Byington, John C. Hilgenberg, Andre R. Brillaud, Paul G. Lowell, Deborah Satterwhite, Jane H. Bennett and Jeanne T. Hugg, are former management employees of Synthecell/Vega Biomolecules Corporation ("SVB") a subsidiary of Synthecell Corporation. While asserting myriad claims, plaintiffs essentially allege that their employment was wrongfully terminated after defendants, Charles S. Atkinson, Sr., and Robert Green, wrested control of Synthecell and SVB from them.[1]

Defendants have moved to dismiss some of plaintiffs' claims and have moved for summary judgment as to others.

I.

A.

Plaintiff Byington first became associated with Synthecell when he represented it as a member of à law firm that served as its outside counsel. In early 1991, he became Synthecell's general counsel. In February 1992, he was appointed as president and chief operating officer of Synthecell and all of its subsidiaries, including SVB. Byington had a written employment agreement for the period February 1, 1992 to June 30, 1996 at an annual salary of $180,000 plus annual adjustments. As further compensation, he was to receive periodic stock options, performance bonuses and other incentives. The agreement provided that Byington's employment could be terminated without cause by a simple majority of the directors of Synthecell, but in that event Byington would be entitled to receive substantial liquidated damages. The agreement further provided that Byington's employment could be terminated for cause either upon his conviction of a felony or if two-thirds of Synthecell's directors "in good faith determined, in its sole discretion, that ... [Byington] is guilty of willful breach of this Agreement, habitual neglect of [his] duties under this Agreement or gross mismanagement of the Company." If Byington was terminated for cause, he had no right to receive any additional compensation or other benefits.

Hilgenberg served as the chief executive officer of Synthecell, the chief financial officer of both Synthecell and SVB and as a director of Synthecell. Brillaud served as the executive vice-president of operations for SVB. Lowell served as the vice-president for corporate development of Synthecell and

---

1. Plaintiffs originally named as additional defendants Synthecell, SVB and Charles Atkinson, Jr. Synthecell and SVB are now in bankruptcy, and this action is stayed as to them. Plaintiffs have voluntarily dismissed with prejudice their claims against Atkinson, Jr.

SVB. Satterwhite served as the vice-president of operations for SVB. Bennett worked for SVB as an executive assistant. Hugg served as SVB's director of human resources. All of these plaintiffs had substantial compensation packages, including salaries ranging from $40,000 for Bennett to $130,000 for Hilgenberg, plus stock options and bonuses.

### B.

Synthecell acquired its controlling interest in SVB in February 1992. Both companies were losing money at the time, but Synthecell projected that it would reach profitability by July 1992 and remain profitable thereafter. It was also projected that Synthecell would receive from $2 million to $4 million in new equity.

Unfortunately, none of these projections proved true. At the beginning of August 1993 (the month in which the employment of plaintiffs was terminated) Synthecell and SVB had only a little more than $10,000 in cash on hand and had to discharge obligations totalling more than $40,000 by August 6. The companies hoped to receive $50,000 in collections by mid-month, but $73,000 in debts were to become due early in the week of August 9. Furthermore, the companies were accruing payroll and related expenses at the rate of $231,000 per month; these expenses were projected to leave the companies with a cash shortfall of $340,000 by the end of August. In addition, one of the companies' vendors had announced that it would repossess its equipment on August 12 unless it was paid approximately $122,000.

To make matters worse, Hoffman–La-Roche, the companies' largest customer which accounted for over 50% of their monthly business, had suspended all of its orders. In light of this development, it was projected that the companies, after having lost $1 million during the first six months of 1993, would lose from $200,000 to $300,000 per month for the rest of the year.

The efforts made by Byington and other members of senior management to raise new capital had been unsuccessful. As a result, at the end of 1992 and early in 1993 Byington, on behalf of Synthecell, entered into negotiations to sell the controlling interest in

another Synthecell subsidiary, Genetic Medi-Syn Corporation, to Medicis Pharmaceuticals. The initial closing of this transaction, scheduled for February 1993, failed, in part because a member of the Medicis negotiating team believed that Byington had made misrepresentations to him. In order to resurrect the deal, Synthecell's board relieved Byington of his negotiating duties and substituted defendant Green in his stead. With the assistance of plaintiff Lowell, Green resumed the negotiations and brought them to a conclusion. However, Synthecell was not in a strong negotiating position because of its need for cash; therefore, the proceeds of the sale were substantially less than Synthecell had hoped ($1.8 million instead of $4 million).

SVB entered into a letter agreement with Midwood Securities, Inc. in February 1993, calling for Midwood to serve as SVB's agent and privately placing approximately $8 million in securities. During the same month, CIT Group/Venture Capital, Inc. ("CIT") submitted a proposed term sheet, stating conditions under which it would contemplate serving as the lead or co-lead investor in the private placement.

By a memorandum dated February 25, 1993, Byington advised Synthecell's board that he anticipated that the private placement would close by April 15, 1993. This did not occur and on April 16, Byington sent a note to a number of directors stating that "Paul [Laud of CIT] and Park [Benjamin of Midwood] believe that we are still on target for funding by the end of the month." Again, the deal did not close as projected, and Synthecell and SVB had to obtain a bridge loan to finance their operations until the completion of the private placement. In a memorandum to the directors on April 30, 1993, Byington stated that "[w]e expect that funding to occur in May, but we have built in the necessary contingencies unless it takes until early June."

By the middle of June, the private placement still had not closed. On June 18, Byington and Lowell attended a meeting in the offices of Paul Laud of CIT in New York. Also participating in the meeting were representatives of CIT, Midwood and Venkol, Inc.,

another potential investor. During the meeting CIT conditioned its investment on SVB's ability to raise at least $5.5 million and to secure the participation of a third institutional investor (in addition to itself and Venkol).

By a memorandum dated June 21, 1993, Byington advised SVB's board of efforts to bring the "third institutional investor ... to the table" by the end of the month. These efforts did not bear fruit, and in a memorandum dated June 28, 1993, he stated that SVB did "not have the third institutional investor at $1.5 million required by Venkol and CIT." He further stated:

> Since August is a terrible month in which to do a deal, I believe that the earliest possible funding time frame extends well into September.... This is not a viable alternative unless there is another infusion of cash in the companies. And frankly, I do not know where that cash would come from at this time.

In the same memorandum, Byington asserted "[w]e can get through July, but not July payroll."

### C.

A number of shareholders and directors, including Atkinson and Green, had begun to question Byington's ability to lead Synthecell and SVB after the initial failure to close the Genetic Medisyn deal. On March 14, 1993, Atkinson and Green circulated a proposal to some of the directors (but not Byington and Hilgenberg) referring to the "dire situation" in which Synthecell found itself. The memorandum proposed substantial staff reductions and the replacement of Byington and Hilgenberg by Atkinson and Green in the top executive positions. The proposal did not win the support of a majority of the directors, in part because some directors believed that a change in the management team would jeop-

ardize the private placement efforts that were then under way.

In August, however, after the private placement office had failed and the company stood on the brink of financial disaster, a majority of Synthecell's shareholders and a majority of the directors of Synthecell and SVB had come to believe that Byington had to be replaced and the employment of other members of senior management terminated. The formal actions were taken pursuant to written consents in lieu of formal meetings. Actual authority for the actions was obtained by the effective date of the consents, August 12, 1993, but the consents themselves were not signed until some time thereafter.

### II.

Against this background plaintiffs assert claims against Atkinson and Green for tortious interference with business relations, breach of a fiduciary duty allegedly owed by corporate directors to a corporation's shareholders and employees, breach of a fiduciary duty owed by persons controlling the majority of a corporation's stock to minority stockholders and fraud.[2] In addition, plaintiffs assert a claim under Section 510 of ERISA. As indicated above, defendants have moved to dismiss and/or for summary judgment as to each of the claims.[3]

### III.

Under Maryland law (which the parties agree apply to plaintiffs' state law claims), a tortious interference with business relation claim requires three actors: two parties who have a business relationship and a third party who interferes with that relationship. *K & K Management, Inc. v. Lee*, 316 Md. 137, 557 A.2d 965, 973 (1989). If the actor who is interfering with the relationship is an agent of one of the actors in the relationship, their claim for tortious interference

---

**2.** Because he had a written employment contract, Byington frames his tortious interference claim as one for tortious interference with contract rather than tortious interference with business relations.

**3.** Defendants filed their summary judgment motion after filing their motion to dismiss. Inexplicably, plaintiffs allege that by filing their summary judgment motion, defendants abandoned the arguments that they made in their motion to dismiss. Plaintiff cite no authority for this proposition and it is without merit. Defendants acted entirely responsibly in engaging in some discovery in order to move this litigation along and they certainly did not waive their right to pursue arguments that they had made in their motion to dismiss by doing so.

fails. *Continental Casualty Co. v. Mirabile,* 52 Md.App. 387, 449 A.2d 1176, 1185 (1982).

■ Plaintiffs attempt to create the necessary tripartite relationship by arguing that Atkinson and Green were not acting on behalf of Synthecell and SVB on August 12, 1993 because they had not given Byington and Hilgenberg the notice to which they were entitled, as directors, under the companies' bylaws before action was to be taken in lieu of a meeting. Further, plaintiffs challenge the procedure followed by defendants in having the consents of shareholders and directors in lieu of meeting formally executed after the fact.

Defendants do not deny that the bylaws were not strictly complied with in all respects. On the other hand, plaintiffs do not deny that, in fact, Atkinson and Green had the actual authority of a majority of the shareholders and directors to act. That concession ends their agreement. By its very nature tort law looks to substance, not form, and defendants' non-compliance with corporate formalities does not convert their actions into tortious misconduct.

■ There are other fatal weaknesses in plaintiffs' tortious interference claims. First, the uncontradicted record establishes that plaintiff Hugg resigned from her position, not that her employment was terminated. Second, the remaining plaintiffs—other than Byington—were at-will employees. As such, they could prevail on their tortious interference claim only if they showed that Atkinson and Green employed wrongful means, such as " 'violence, intimidation, injurious falsehood or other fraud, violated the criminal law, and instituted, or threatened, groundless civil suits or criminal prosecutions in bad faith.' " *Macklin v. Logan,* 334 Md. 287, 639 A.2d 112, 119 (1994) (*citing K & K Management, Inc. v. Lee,* 557 A.2d at 979). They have not done so on the present record.

Most fundamentally, none of the plaintiffs have shown that defendants took the challenged actions for an "unlawful purpose" as

required for establishing a tortious interference claim. In August 1993, Synthecell and SVB were, in Byington's own words, "in dire straits." Their financial condition was dismal, and both the short term and long term financial projections were even worse. Salaries being paid to plaintiffs constituted a severe strain on what was already the companies' negative cash flow. Senior management had been unable to raise new capital for the past eighteen months. Under these circumstances Atkinson and Green (who themselves had a substantial financial stake in the companies) were fully justified in taking action to persuade a majority of the companies' shareholders and directors to install them in the top executive positions in place of Byington and Hilgenberg and to improve the companies' cash flow by terminating the employment of all the plaintiffs.[4]

## IV.

### A.

■ Several of the plaintiffs (Byington, Hilgenberg, Hugg and Bennett), as shareholders of Synthecell or SVB, claim that defendants breached the fiduciary duty which they, as directors of the companies, owed to its shareholders. Plaintiffs admit that they have not either unsuccessfully demanded that the boards of Synthecell and SVB commence litigation on the corporations' behalf or that it would be futile to make such a demand. As a general rule, both the Federal Rules of Civil Procedure and Delaware law (which the parties agree apply to plaintiffs' breach of fiduciary claims) require that these preconditions to suit be met. *See Fed.R.Civ.P.* 23.1; *Aronson v. Lewis,* 473 A.2d 805, 808 (Del.1984).

■ Plaintiffs contend, however, that they fall within an exception to the derivative suit requirements recognized by Delaware law. This exception applies if plaintiffs have alleged "either 'an injury which is separate and distinct from that suffered by other shareholders,' . . . or a wrong involving a contrac-

---

**4.** Plaintiffs have also not addressed defendants' argument that the summary judgment record establishes that they could not prove any damages resulting from defendants' action. In that regard, it appears that in light of the companies' financial position, if plaintiffs had continued in their positions, there would have been inadequate corporate revenues to pay them.

tual right of a shareholder, such as the right to vote, or to assert majority control...." *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.Ch.1985), *quoting* 12B *Fletcher CYC Corp.*, § 5921 (Perm.Ed.1984). Put another way, the exception applies where plaintiffs allege that they sustained a "special injury" to their rights as shareholders that other shareholders did not suffer. *Elster v. American Airlines, Inc.*, 100 A.2d 219, 223 (Del.Ch.1953).

*Lipton v. News Int'l PLC*, 514 A.2d 1075 (Del.1986), provides an example of where a shareholder was permitted to bring an individual action on its own behalf. *Lipton* involved an attempt by the members of the management of Warner Communications to prevent News International from gaining enough shares in Warner to oust them. They did this by engaging in a series of stock transfers that gave them and their corporate allies a large enough percentage of Warner stock to prevent their removal. News International then sued claiming that the stock transfers were a waste of corporate assets and that they were effected to prevent News from exercising its votes to influence Warner's management. The Delaware Supreme Court held that News had an individual claim against Warner because, by depriving it of its voting rights, Warner injured it in a manner that other shareholders were not.

> [T]he Warner/Chris–Craft exchange agreement violated [News'] voting rights by securing for Warner management a veto power over all shareholder actions subject to the 80% supermajority voting requirement. We find that this allegation constitutes special injury to News ... thus forming the basis for a viable individual cause of action against Warner. The right to vote is a contractual right that News possesses as a shareholder of Warner which is independent of any right of Warner.

*Id.* at 1079.

■ The present case stands in stark contrast to *Lipton*. Here, plaintiffs' primary claim is that defendants' actions reduced the value of their stock and stock options. Claims such as this provide the basis of prototypical shareholder derivative actions in which Delaware courts have repeatedly re-

jected attempts to characterize the suits against the fiduciaries as "individual." *See, e.g., Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348 (Del.1988); *Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del.1970); *Litman v. Prudential Bache Properties, Inc.*, 611 A.2d 12 (Del.Ch.1992); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.Ch.1985).

■ An ancillary claim made by plaintiffs—that defendants affected plaintiffs' ability to exert potential control over Synthecell by ultimately terminating their stock options—presents a closer question. In depriving plaintiffs of their options, defendants did directly affect plaintiffs' potential voting rights. If plaintiffs had been able to exercise their options, they would have had a greater say in the management of the company and might have been able to take steps to prevent their ouster. Thus, to the extent that depriving plaintiffs of their stock options diluted their voting stakes, plaintiffs might seem to have stated a claim that falls within the ambit of *Lipton*—a personal injury caused by the undermining of a particular shareholder's voting rights. *Lipton*, 514 A.2d at 1079.

There are two reasons, however, why plaintiffs' options cannot form the basis for an individual action. First, it is unclear whether under Delaware law a corporate fiduciary owes a duty of any kind to the owner of a stock option. In *Simons v. Cogan*, 549 A.2d 300 (Del.1988), the Delaware Supreme Court held that corporate directors do not owe a fiduciary duty to a convertible debenture holder unless that debenture has actually been converted into stock. "[A] mere expectation," the Court reasoned, "does not create a fiduciary relationship." *Id.* at 304. There is no reason why the *Simons* court's logic—that "a convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of ... fiduciary duties"—should not apply to the case at hand. *Id.* at 303. Plaintiffs' stock options were in payment for services they provided. Furthermore, the *Simons* plaintiffs' debentures had a greater potential for corporate voting power than plaintiffs' options did. *Si-*

*mons* does not indicate that there was any restriction on the conversion of debentures into stock. In this case, on the other hand, plaintiffs' options were part of a detailed incentive scheme whereby plaintiffs could only exercise the options after completing certain tasks on behalf of the company. At the time that plaintiffs were ousted, none of these tasks had been completed. Thus, plaintiffs' options were far removed from representing actual ownership of Synthecell or the voting rights that would go therewith.

■ The second reason that the elimination of plaintiffs' options cannot form the basis for an individual action against defendants is that those options, and the potential voting rights which go along with them, were based upon plaintiffs' employment contract, not on their rights as shareholders. Delaware law requires that individual shareholder claims against corporate fiduciaries must be based on rights incident to stock ownership. *Lipton*, 514 A.2d at 1078; *Moran*, 490 A.2d at 1070. Here, plaintiffs' right to exercise the stock options stemmed from their employment contracts not from any right as shareholders. Until plaintiffs completed tasks required under their employment agreements, the options could not be exercised and plaintiffs did not have any rights as shareholders (or even as potential shareholders) that could be abridged by the corporate fiduciaries.

### B.

■ Plaintiffs also claim that defendants breached a fiduciary duty that they allegedly owed to plaintiffs as employees rather than as shareholders. No Delaware case holds or suggests that such a duty exists. To the contrary, the Delaware cases speak only of the fiduciary duty owed by directors to the corporation itself and its shareholders. *See, e.g., Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 729 (Del.1988) (directors owe fiduciary obligations "to the corporation and its shareholders"); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984) (the existence and exercise of the directors' power to manage the corporation's business and affairs carries with it certain fundamental fiduciary obligations "to the corporation and its shareholders"); *Singer v. Magnavox Co.*, 380 A.2d 969, 977 (Del.1977) (directors owe a fiduciary obligation to "their corporation and its minority shareholders"). Any contrary rule would place intolerable and irreconcilable conflicts of interest upon the directors.

### C.

■ Byington, Hilgenberg, Hugg and Bennett assert a third breach of fiduciary duty claim, allegedly arising out of a duty owed to them as minority shareholders by Atkinson and Green as persons controlling a majority of shares. There are three reasons why these claims fail.

First, plaintiffs concede that Synthecell owns 89% of the stock of SVB, that Green did not own a single share of stock in Synthecell and that at most Atkinson owed or controlled only 7.4% of Synthecell's shares. Thus, Atkinson and Green, neither alone or together, were majority shareholders of SVB or Synthecell. Plaintiffs allege that they controlled a majority of shares, however, by "proxies" that they had solicited. The summary judgment record does not substantiate in any way the averment that Atkinson and Green held proxies from other shareholders. Rather, the record establishes that other shareholders had voted their own shares to confer authority upon Atkinson and Green to take the actions of which plaintiffs complain.

Second, plaintiffs have not alleged any injury that they have suffered in their status as minority shareholders. Rather, their claims arise from the termination of their employment as officers of the companies.

Third, even if defendants did owe a duty to plaintiffs as minority shareholders, they did not breach that duty. For the reasons previously stated their decision to terminate plaintiffs' employment was fully justified under the circumstances and was not in any way wrongful.

### V.

■ When plaintiffs' employment was terminated, they lost certain benefits that are covered by ERISA. Because of this fact, they have asserted a claim under Section 510 of ERISA. 29 U.S.C. § 1140. The purpose

of Section 510 is to prohibit employers from discharging or harassing their employees for the purpose of preventing the employees from obtaining vested pension rights or blocking vested employees from accruing additional benefits. *See, e.g., Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237 (4th Cir.1991). In order to prevail, plaintiffs must prove that Atkinson and Green acted with the "specific intent" to interfere with their protected rights. *Id.* at 239.

Plaintiffs have not come forward with any evidence to demonstrate that either defendant had this intent. The Fourth Circuit has cautioned that in a case such as this "it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing of the employer's pension obligation was a motivating factor in the firing decision." *Id.* at 238. Here, the uncontradicted record establishes that what motivated Atkinson and Green was their dissatisfaction with the executive leadership that Byington and other members of senior management were providing and the severe drain that payment of their salaries was having upon the cash flow of Synthecell and SVB. If plaintiffs were to be permitted to withstand defendants' summary judgment motion on this record, any discharged employee whose compensation included ERISA-protected benefits would have a cause of action under ERISA. That clearly is not the law.

## VI.

■ Plaintiffs' final claim is for fraud. The essence of this claim is that by March 1993 Atkinson and Green had formed the intention and developed the plan to take over management of the companies and terminate the employment of plaintiffs. According to plaintiffs, Atkinson and Green concealed their plan from plaintiffs and, as a result, plaintiffs proposed a plan (adopted by Synthecell's directors in March) to defer their salaries and continue to forebear on personal loans made to Synthecell. Further,

several of the plaintiffs personally guaranteed the bridge loan made by Synthecell in May 1993.

■ In order to prevail on their fraud claim, plaintiffs must produce clear and convincing evidence of the fraud. *See, e.g., Everett v. Baltimore Gas & Elec. Co.*, 307 Md. 286, 513 A.2d 882, 890 (1986). They have failed to do so. Indeed, the record establishes that no fraud was committed.

First, the record establishes that Atkinson and Green did not conceal their intention to replace the senior management of the companies in March 1993. A note sent on March 3, 1993 by Byington to an acquaintance concerning a board meeting to occur the next day stated: "It should be interesting.... Rob Green wants 'new senior management'. The plan has impressed many of the other guys like Angus and MacDonald—so we'll see." Similarly, notes that Hugg took of the March 4 meeting state that Green expressed "no confid[ence] in management" and was of the view that the board should "remove Sr Mngmt." Byington, Hilgenberg, Lowell and Hugg were all at the meeting. Moreover, a letter sent by Byington to Norman Angus, Synthecell's chairman, on March 5, 1993 clearly reflects his knowledge of the proposal that Green had made to cut back in staff. Byington wrote: "We cannot so cut back the people ... as to set ourselves up for failure." [5]

Second, the record establishes that Green voted against (and Atkinson abstained from voting upon) the proposal made by Byington that plaintiffs defer their salaries in exchange for bonuses. This flatly contradicts plaintiffs' theory that defendants induced the salary deferral. Similarly, Green and Atkinson opposed the making of the bridge loan that several of plaintiffs personally guaranteed.

Third, fraud involves *wrongful* conduct, and for all of the reasons previously stated, defendants committed no wrong whatsoever in taking actions to terminate plaintiffs' employment.

---

**5.** In light of this evidence plaintiffs are left only to argue that defendants did not show them a written memorandum that they had prepared describing their plan. Obviously, defendants were under no duty to do so.

## VII.

In October 1993, shortly before this suit was filed, Paul Lowell, one of the plaintiffs, spoke by telephone to Charles MacDonald, one of Synthecell's directors. In the conversation Lowell characterized the lawsuit as "a vendetta." It is now time for the vendetta to come to an end. An order entering judgment on behalf of defendants is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein, it is, this 17th day of November 1994

ORDERED

1. Defendants' motion to dismiss is granted;

2. Defendants' motion for summary judgment is granted;

3. Judgment is entered in favor of defendants against Byington as to Count II;

4. Judgment is entered in favor of defendants against Byington as to Count III;

5. Judgment is entered in favor of defendants against plaintiffs (other than Byington) as to Count VI;

6. Judgment is entered in favor of defendants against plaintiffs as to Count VII;

7. Judgment is entered in favor of defendants against plaintiffs as to Count IX;

8. Judgment is entered in favor of defendants against plaintiffs Byington, Hugg, Hilgenberg and Bennett as to Count X; and

9. Judgment is entered in favor of defendants against plaintiffs as to Count XI.