# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 00-2758

GEORGE HARPER and ROBERT PADILLA,

*Plaintiffs-Appellants*,

v.

LIEUTENANT ALBERT, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 97-775-CJP—**Clifford J. Proud**, *Magistrate Judge*.

_____

ARGUED JUNE 5, 2003—DECIDED MARCH 17, 2005

_____

Before FLAUM, *Chief Judge*, and COFFEY and MANION,
*Circuit Judges*.

COFFEY, *Circuit Judge*. On September 15, 1997 two pris-
oners, George Harper and Robert Padilla, confined at the
Menard Correctional Facility in Menard, Illinois, filed a com-
plaint in the United States District Court for the Southern
District of Illinois pursuant to 42 U.S.C. § 1983, claiming
that twelve prison guards and two supervisors, who are
members of the "Orange Crush" tactical team, violated their
Eighth Amendment right to be free from cruel and unusual

punishment when guards allegedly battered the two pris-
oners during a cell-transfer procedure. A jury trial ensued,
and following the presentation of the plaintiff's case-in-chief
the defendants moved for judgment as a matter of law,
which was granted as to eight of the fourteen named
defendants. The jury subsequently found in favor of the re-
maining six defendants concluding that, during the time
frame when the assaults had allegedly taken place, no officer
used excessive force. Harper and Padilla now appeal the
district court's decision to dismiss the eight defendants, al-
though they concede the validity of the jury's verdict as to
the remaining six defendants. We affirm.

## I. BACKGROUND

On August 4, 1996 the East Cellhouse at the Menard
Correctional Facility in Menard, Illinois ("Menard") erupted
in violence with inmates throwing cans, burning rags, light
bulbs, bodily fluids and other liquids at officers. This out-
burst was apparently in retaliation for the "strip out," or
complete search, of a cell on the block and continued to grow
more serious throughout the day.

Sometime during the disturbance the situation escalated
to near-riot proportions and Correctional Officer Goolsby
was struck in the back of his head with a can of soup, caus-
ing a contusion requiring medical attention. The ranking
officers on duty at the time, Captain Stanley and Lieutenant
Thomas, received reports from other correctional officers
and concluded shortly thereafter that the projectile can was
thrown from Harper and Padilla's cell. Stanley and Thomas
subsequently approached the inmates' cell and informed
Padilla that he and his cell-mate would be removed and
transferred to the segregation unit. Padilla immediately
protested claiming he had not thrown anything, while the
officers informed him that according to eyewitness accounts
someone in the cell had thrown the can. Harper overheard

the conversation and, in Padilla's defense, admitted to throwing the can that hit Goolsby and agreed that he would accept the transfer to segregation willingly. However, when the officers informed the inmates that they both would be going to segregation, regardless of who admitted throwing the can, Padilla immediately refused and Harper joined him and recanted his prior offer to go along peacefully. Nevertheless, after reconsidering, Harper and Padilla had a change of heart and decided to cooperate with the officers and called Stanley and Thomas to inform them.

Proceeding cautiously, Stanley again approached the cell, and while questioning Padilla about the inmates' new-found intention to cooperate, he observed Harper moving towards him with a bowl of hot water (which Padilla later claimed he was heating to prepare soup). Stanley immediately ordered Harper to set the bowl down, and when he refused to do so Stanley sprayed him in the face with mace. Harper reacted by throwing the scalding water at the officers, hitting Thomas, who retreated down the corridor. Stanley continued to spray Harper for a moment and then left the cell and called for backup assistance.

Stanley called for the prison's tactical unit, better known by their nickname, the "Orange Crush."[1] The makeup of the Orange Crush team consists of corrections officers who have undergone specialized training and are called upon by prison officials to assist in controlling unruly or violent inmates. Specifically, the team is also charged with the duty of extracting, or removing, hostile, violent or non-cooperative inmates from their cells and relocating them to other areas of the prison such as the segregation unit, where they

---

[1] As described in *Fillmore v. Page*, 358 F.3d 496, 500 (7th Cir. 2004), while executing their duties at the prison members of the tactical team don shields, gloves, safety glasses and orange jumpsuits, ergo their nickname.

can be monitored more closely. Stanley decided to contact the tactical unit to transfer the prisoners to the segregation area in hopes that they would no longer pose a threat to themselves or other correction officers.

The tactical team members were directed to assemble in full riot gear and thereafter briefed. Cpt. Stanley gave the order and they proceeded to the East Cell house where Harper and Padilla were housed. Twelve (12) tactical team members in all[2] were assigned to transport Harper and Padilla that night. One member of the team, Officer Smithson, was assigned to videotape the maneuver, while four other members were directed to hold shields and give protection to the other officers by providing them cover from flying debris and fluids. Marching in formation dressed in full uniform, the tactical unit reached the East Cell house where they encountered shouting, whistling, hollering and taunts as well as a barrage of fluid and other objects being thrown at them.[3] Lieutenant Albert, the unit's commanding officer, led the unit through the melee to Harper and Padilla's cell. When the unit reached the cell area, Albert approached and ordered the two prisoners to "cuff up," or to back up to the bars of the cell and place their hands behind their backs and through the bars so that officers could handcuff them.

---

[2] Included in the group that night was Lieutenant Albert, the commander of the tactical team, along with Lieutenant Townley, Sergeant Hudsell and officers Ferrell, Scott, Smithson, Lawless, Myers, Skoog, Tindall, Edmonds and Flowers, all of whom (along with Captain Stanley) were defendants in this action.

[3] Some of this fluid landed on Officer Smithson, causing the video camera he was using to tape the transfer maneuver to cease functioning. Therefore, no video record was produced of the cell extraction procedure or the transport of Harper and Padilla to the segregation area.

What happened next is in dispute. Padilla and Harper claim they were brutally beaten by officers while being transported to the segregation unit, while the defendants-appellees, all twelve members of the tactical team along with Captain Stanley, claim the force used was necessary to safely convey and transfer the inmates to the designated segregation area.

Padilla claims the abuse began shortly after he was cuffed when—while waiting for the cell door to be opened—one of the officers grabbed his ponytail and proceeded to bang his head against the bars of the cell approximately three times, then stopped and began to punch him. Once the cell door was opened, Padilla was backed out with his hands cuffed behind his back. One of the officers then placed a police baton between his cuffs and his back so that his torso was positioned parallel to the ground in order to assist in controlling him while leading him out of the cell house to the strip-search area. While en route to the area where he was to be searched, Padilla claims various unidentified officers intentionally and repeatedly slammed him into cell bars and gates as well as punching, elbowing and kicking him throughout the maneuver. Before reaching the strip-search room officers allegedly stopped and asked Padilla if he needed medical attention, to which Padilla answered "no."[4] Padilla was next taken into the strip-search room where he states that officers, at this point, resumed kicking and punching him while others stepped on his hands and neck. Padilla claims he was bleeding profusely throughout the procedure and lost consciousness on at least two occasions before being stripped naked and led up a set of stairs to the segregation unit. Padilla alleges that, among other things, he was once again slammed into a gate and punched in the

---

[4] Padilla claims he refused because he believed that he would be subjected to a worse beating if he requested to be taken to the hospital.

ribs before being forced into a cell. After a medical examination that night, it was concluded that Padilla had sustained a swollen jaw along with a laceration to his head, for which he received eight stitches.

Harper's version of events is much the same as Padilla's in that he also alleges the officers went out of their way to abuse and assault him while being escorted to a segregation cell. Once he was backed out of the cell he shared with Padilla, Harper alleged he was also positioned with his hands cuffed behind his back and an officer along side him using a baton for leverage to keep his shoulders and head down parallel to the floor as they walked. Like Padilla, Harper claims that during the journey to the strip-search room he was slammed into various gates along the way and to receiving numerous punches to the head and face. Harper also claims that, at some point during the walk, an unidentified officer stopped and struck him on the back with a baton, driving him to the ground. When the group resumed walking, Harper described being kneed or punched at every step by the officers in front and back of him. Immediately before entering the strip-search area Harper states that he was asked if he would like medical attention, but declined in fear of a more severe beating. Before being strip searched[5] Harper claims officers brutally beat him all over his body and went on to verbally humiliate him by commenting on his naked form while laughing and joking. Once reduced to his boxer shorts Harper was led to his segregation cell, but before reaching the cell he alleges that the officers went out of their way to run him head-first into whatever metal objects they came upon. When the officers finally delivered him to the segregation cell Harper claims that he was uncuffed and that one of the larger officers grabbed him by the neck and propelled him into the cell causing him to

---

[5]  It is prison policy to strip search all prisoners before confining them in segregation cells.

strike his head on the wall and lose consciousness. While in segregation Harper refused a medical examination and it was not until some two days later that he was examined and was found to have a number of bruises and abrasions on his back.

### A. *District Court Proceedings*

On September 15, 1997, Harper and Padilla filed a complaint in the District Court for the Southern District of Illinois claiming that they had been deprived of their Eighth and Fourteenth amendment rights when unidentified prison officials intentionally assaulted and battered them with the use of excessive force during the transfer procedure on August 4, 1996, and were thus entitled to recover damages pursuant to 42 U.S.C. § 1983. The original complaint identifies only Lt. Albert, the leader of the prison's tactical team, by name. The other defendants were simply referred to as "unknown correctional officers." However, following initial discovery disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, the prisoners amended their complaint and added the names of the eleven previously unidentified members of the Menard Tactical Unit who were present during the extraction and/or transport of Harper and Padilla. The amended complaint added the following parties as defendants: Lt. Townley, Sgt. Hudsell and Officers Ferrell, Scott, Smithson, Lawless, Myers, Skoog, Tindall, Edmonds, and Flowers, as well as Cpt. Stanley and Lt. Thomas[6] who the defendants claimed,

---

[6] Lt. Thomas was voluntarily dismissed from the suit shortly after the amended complaint was filed when plaintiffs discovered that although Thomas was present during the beginning of the incident, he departed the area before any of the alleged constitutional violations took place.

along with Lt. Albert, acted in a supervisory role over the alleged constitutional violations. Although their amended complaint detailed the alleged instances of abuse that both prisoners supposedly endured on August 4, 1996, and identified the guards present, the complaint failed to allege which of the individual officers allegedly beat, kicked or otherwise used excessive force against Harper and/or Padilla.[7] The defendants promptly filed an answer with the court denying that they had violated any of Harper and Padilla's constitutional rights and raised a number of affirmative defenses.[8]

Upon completion of discovery, the parties commenced their preparations for trial and consented to have Magistrate Judge Proud hear their case. Thereafter, the magistrate judge issued a "Final Pre-Trial Order" which described the nature of the case as one dealing exclusively with claims of excessive force.[9]

---

[7] This is despite the fact that Harper and Padilla were provided with discovery, before filing their amended complaint, in the form of Department of Corrections incident reports and interviews that identified the defendants by name who were present during each phase of the alleged abuse.

[8] The defendant guards claimed, among other things, that they were protected by the doctrine of qualified immunity as state prison employees. They also claimed that the use of force under the circumstances was justified in this case and did not constitute a violation of the law.

[9] The judge stated: "Plaintiffs are inmates who, at the time, were imprisoned at Menard Correctional Center, allege that their rights were violated in that defendants, who are prison officers and guards, maliciously, sadistically, and unnecessarily beat plaintiffs as they were being moved from the East Cell House to the segregation unit." We note here that it is extremely clear that the magistrate judge interpreted the plaintiffs' legal claim as one alleging excessive force and not failure to intervene as the plaintiffs later claimed.

The trial commenced on June 5, 2000, and during the plaintiffs' case-in-chief Harper and Padilla testified to essentially the same course of events set out above, *i.e.*, that the Menard Tactical Unit used excessive force by beating, kicking and generally abusing them in between the time-frame when Padilla threw the can of soup at Officer Goolsby and they were delivered to their segregation cells. Like in their complaint, however, neither Harper nor Padilla identified any individual guard who was abusive.

At trial, Lt. Albert was called to testify and stated that the procedure used to transport Harper and Padilla was for the most part routine. Albert testified that the two prisoners refused to cooperate with the officers and had to be forcibly restrained on two different occasions during the transfer; when they refused to exit their cell, and when each of them individually underwent the prison's mandatory strip-search procedure for each person prior to being admitted to the segregation unit (at which time Albert stated that he was forced to kneel on the backs of both prisoners in an attempt to restrain them so that they could be thoroughly searched). Indeed, Albert conceded that any injuries Harper sustained to his back could, in all probability, be attributable to his kneeling on Harper in the strip-search area after Harper had refused to comply with the officers' orders prior to and during the strip-search procedure. Albert, on the other hand, denied that any tactical unit member used excessive force, at any time, while restraining and/or transporting Harper and Padilla. Specifically, he testified that at no point did he witness either of the prisoners come into contact with anything (*i.e.*, doors, walls or bars) while they were being led by officers. In addition, he stated that he never saw any guard strike (with a baton or fist), kick or punch either Harper or Padilla during the entire encounter (from the time they were forcibly removed from their cell until the moment they were deposited in their individual segregation cells).

The Plaintiffs also called Officer Smithson, the officer who was responsible for carrying the video camera[10] on the day of the alleged incident, to testify as to the reason why the video camera malfunctioned. According to Smithson, he was the last member of the unit to enter the floor where Harper and Padilla's cell was located and he and the camera were immediately hit by a bag of urine which caused the camera to cease operating. Smithson claimed that he attempted to continue to operate and repair the camera, but that he was unsuccessful because it was too badly damaged. He remained with the unit until Padilla and Harper were escorted out of the cell house, but instead of following them to the strip-search or segregation area, he proceeded to Cpt. Stanley's office to report the problem and turn the camera in.

In addition to the testimony of Harper, Padilla, Albert and Smithson, a number of fellow inmates testified in an attempt to corroborate the prisoners' claims of abuse. This testimony was introduced to describe the physical condition of the inmates after the alleged abuse was allegedly visited upon them. For example, fellow prisoner William Rudder testified that as he witnessed Padilla being placed in the segregation cell he observed that "he looked pretty beat up," and that there was "blood coming off his face." Other prisoners testified that, in addition to witnessing the physical condition of the prisoners, they actually viewed guards hitting and kicking them. However, none of the prisoners who testified were able to identify the specific guards that they alleged were abusing Harper and Padilla.

After the prisoners completed presenting their case-in-chief, the defendants moved for judgment as a matter of law

---

[10] Ironically the purpose of using the video camera to record transfer procedures such as this one is to insure that the guards are protected from the very sort of liability that they faced in this case.

pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure. Prior to ruling on the motion, the judge clarified the nature of the case by asking plaintiffs' counsel whether this case indeed constituted "an 8th Amendment excessive force case against the defendants based on these beatings and related things like beatings that started with moving the plaintiffs out of Cell 214 in the East Cellhouse and continuing all the way to the North Cellhouse Segregation . . . where they were placed." (Tr. VIII. p. 9). Counsel for Padilla and Harper answered in the affirmative, acknowledging that the claims presented were premised on excessive force under the Eighth Amendment. In spite of this on-the-record concession, plaintiffs' counsel, for the first time in the proceeding, interjected what they now claim to be a failure to intervene argument. In addition, counsel for Harper and Padilla continued to argue that joint and several liability should apply in this case because all of the guards were "participating in a joint action to beat the crap out of these guys . . . [and] [a]s a result, they should all be found liable if the jury believes all of our testimony." (Tr. VIII p. 19) In order to address plaintiffs' counsel's arguments, the trial judge once again reiterated that this was an excessive force case and did not encompass a failure to intervene claim, and explained that when proceeding under an excessive force theory "a plaintiff must establish a defendant's *personal liability* for the claimed deprivation of the constitutional right . . . [t]he personal responsibility requirement is satisfied if the official acts or fails to act, *and here we are dealing with acting, not failing to act.*" *Id.* (emphasis added). The judge went on to state that "[t]here is no joint and several liability in an 8th Amendment case like this . . . we only have individual liability where it has been shown that each defendant did something to one . . . or both plaintiffs that would be an 8th Amendment violation." Having framed the issue more precisely as one involving excessive force (and specifically disallowing any argument for failure to intervene), the magistrate judge proceeded to

rule on the defendants' Rule 50(a)(1) motion by identifying the individual officers which the evidence established could, as a matter of law, be found to have used excessive force.

The magistrate judge concluded from his knowledge and review of the evidence submitted during the plaintiffs' case-in-chief that only five of the thirteen named defendants had actually been in physical contact with the plaintiffs and, therefore, the other eight defendants should be dismissed.[11] The court ruled that Lt. Albert, Officers Ferrell, Scott, Lawless and Edmonds all assisted in restraining Harper and/or Padilla in some fashion and therefore a reasonable jury might conceivably conclude that they violated Harper and Padilla's constitutional rights by using excessive force. Specifically, the judge went on to conclude that Lt. Albert would remain in the case as to both Harper and Padilla. On the other hand, he stated that only Ferrell and Scott would remain in the case as defendants to Harper's claims while Edmonds and Lawless would remain in the case as defendants to Padilla's claims. However, the judge concluded that Ferrell, Scott, Lawless and Edmonds could only be considered as defendants as to their actions during the events which took place while the prisoners were being transferred from the East Cellhouse to the strip-search area (and while in the strip-search area), and not for the allegations of abuse which allegedly took place during the transfer of the prisoners from the strip-search area to segregation cells.

The trial resumed with only five of the defendants remaining in the case. The defense presented its case-in-chief

---

[11] As to defendants Stanley, Townley, Hudsell, Smithson, Myers, Skoog, Tindall and Flowers, the magistrate judge found that Harper and Padilla had failed to establish that those defendants had made any physical contact with the inmates during the extraction and transport maneuver and thus under the controlling law a reasonable juror could not find them liable for an Eighth Amendment violation.

and each of the defendants took the stand testifying that at no time did they kick, hit, knee, or in any way injure the plaintiffs nor did they see any other officer engage any actions that were not necessary to safely restrain and transport the prisoners. In addition, the nurse who examined Padilla and Harper testified as to the contents of the prisoners' medical records, which reflected that after the transfer Padilla had some swelling on his face and shoulders, had complained of jaw and rib pain (x-rays on both were negative for fracture) and had received stitches to close a 1/4" laceration on his head. The record also notes that Harper did not seek medical attention until two days after the alleged abuse and was subsequently examined by the prison nurse who determined that Harper had bruising and some minor abrasions on his back.

Following the close of evidence, the plaintiffs moved for reconsideration of the court's Rule 50 judgment based on their interpretation of the evidence uncovered during the defense's case which they claim demonstrated that Officer Scott had physical contact with Harper on the way from the strip-search area to the segregation cell and that Lawless had control over Padilla during the same period of time. Relying on *Mayer v. Gary Partners and Co. Ltd.*, 29 F.3d 330 (7th Cir. 1994), the judge denied the motion stating that the evidence the plaintiffs were relying upon was submitted after the court's Rule 50 motion, which was proper at the time and which he still believed to be correct. (Tr. VIII. p. 256). The judge stated that "[t]he fact that we have now found out later that certain of the defendants still in the case were escorting one or more of the plaintiffs to their actual Segregation cells from the [strip-search] room . . . doesn't change anything . . . [s]o I will deny the motion." (Tr. VII. p. 257). Also, the remaining defendants renewed their motions and the court took them under advisement pending the verdict of the jury.

B. *The Jury Verdict*

After deliberating for less than half-an-hour the jury found in favor of the remaining defendants on both Harper and Padilla's Eighth Amendment excessive force claims. Also, the jury answered two special interrogatories that read as follows:

> Do you find that any of the force used against Plaintiff Harper by any prison employee, while transporting him from his cell in the East Cellhouse to the [strip-search] room or while in the [strip-search room], constituted cruel and unusual punishment as that term is defined elsewhere in the instructions?

and

> Do you find that any of the force used against Padilla by any prison employee, while transporting him from his cell to the East Cellhouse to his final destination in the North Cellhouse, constituted cruel and unusual punishment, as that term is defined elsewhere in the instructions?

(Tr. IX. p. 37-38). Jurors answered "No" to both of these special interrogatories and then reiterated their ruling in favor of each of the five remaining defendants when polled by the judge.

## II. Discussion

Although Harper and Padilla concede that the jury verdict was proper in all respects, they allege that the magistrate judge improperly granted the defendants' Rule 50 motion at the close of their case-in-chief dismissing defendants Stanley, Townley, Hudsell, Smithson, Myers, Skoog, Tindall and Flowers. In addition, they claim that they should have been allowed to present a theory of the case that would have allowed the jury to conclude that all of the defendants were jointly and severally liable for violating Harper and Padilla's Eighth Amendment rights by using excessive force

or failing to intervene while a constitutional violation (cruel and unusual punishment by the use of excessive force) was occurring. In conjunction with these claims, the appellees also claim that the magistrate judge gave the jury instructions that erroneously limited the facts which the jury could consider when determining whether a constitutional violation had occurred (*i.e.*, the judge would not let them present facts which would establish their joint and several liability argument) and that the court's decision to advise the jury regarding the defendants' indemnification was in error. We disagree.

## A.  *Rule 50 Dismissal as a Matter of Law*

We review a district judge's, or in this case a magistrate judge's, decision to grant a party judgment as a matter of law *de novo*, while viewing all the evidence in the light most favorable to the nonmoving parties, Harper and Padilla. Rule 50 of the Federal Rules of Civil Procedure prescribes that judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1); *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2003). We will uphold a trial court's grant of judgment as a matter of law only if, after viewing all the evidence, no reasonable jury could have found for Harper and/or Padilla on each essential element of their claim. *See Campbell v. Peters*, 256 F.3d 695, 699 (7th Cir. 2001).

## 1.  Events Covered by the Jury's Verdict

Harper and Padilla claim that the trial judge incorrectly granted the defendants' Rule 50 motion because, under a theory of joint and several liability, a reasonable jury could have found in their favor, *i.e.*, but for the dismissal the jury

could have found that the eight defendants that were dismissed had violated Harper and Padilla's constitutional rights on a joint and several liability theory. Their argument is misplaced in great part.

Joint and several liability is a theory of recovery which requires that the plaintiffs, in an action alleging tortious or constitutionally repugnant conduct by multiple actors, establish that each defendant acted in concert to "produce a single, indivisible injury." *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985). In their brief, appellants cite a number of cases for the proposition that joint tort-feasors may be held jointly and severally liable when "several persons act pursuant to a common plan or design to commit a tortious act." *In re Uranium Antitrust Litigation*, 473 F.Supp. 382, 387 (N.D. Ill. 1979); *Watts v. Laurent*, 774 F.2d 168 (7th Cir. 1985); *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir. 1984); *Smith v. Eli Lilly & Co.*, 527 N.E.2d 333 (Ill. 1988). However, the underlying legal theory upon which all the cases that Harper and Padilla cite is that in order for defendants to be held jointly and severally liable, *all* of the named defendants must have visited some manner of wrong (here a constitutional violation) on the plaintiff. Indeed, in the § 1983 cases cited by the appellees, *Watts v. Laurent*, and *McKinnon v. City of Berwyn*, we considered the applicability of joint and several liability only *after* a jury had found all the named defendants liable for concurrently violating the plaintiff's constitutional rights. On a number of occasions we have specifically held that in order for liability to attach under § 1983, "an individual must have personally caused or participated in the alleged constitutional deprivation." *See Palmer v. Marion* Co., 327 F.3d 588, 594 (7th Cir. 2003), *accord Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). Thus, applying this principle to the case at hand; for joint and several liability to have any application here, under the Rule 50 standard, the plaintiffs' case should have been dismissed as a matter of law unless,

viewing the evidence in the light most favorable to Harper and Padilla, a reasonable jury could have concluded that *all thirteen* of the original defendants violated each prisoner's Eighth Amendment rights during the cell transfer and transport procedure. *See id.* However, the evidence Harper and Padilla submitted at trial, as evinced by the jury's verdict and answers to the special interrogatories, failed to establish that any of the defendants violated either Harper or Padilla's constitutional rights. Indeed, Harper and Padilla failed to even establish that each and every one of the defendants ever touched the plaintiffs, much less that any of the guards used excessive force against them. Thus, the appellants claim must fail because, under their own presentation of the case, as well as the evidence submitted to the jury at trial it would not have been possible for a reasonable jury to find that *all* thirteen defendants used excessive force against both Harper and Padilla.[12]

In a futile attempt to bolster their claim, Harper and Padilla later argued that although not all of the defendants used excessive force, the remainder of the defendants were nonetheless culpable for a related constitutional violation; failure to intervene. The first time the plaintiffs articulated this failure to intervene claim was in their answer to the defendants' Rule 50 motion. The defendants argue that this constitutes a waiver on Harper and Padilla's part due to their failure to raise any such failure to intervene claim in the pleadings.

Pursuant to Seventh Circuit and Supreme Court precedent, it is inaccurate for the defendants-appellees to characterize Harper and Padilla's late introduction of this new theory of liability in the case, failure to intervene, as a

---

[12] Indeed, the record establishes that some of the thirteen defendants were not even present during the time frames when Harper and Padilla claim excessive force was used.

waiver.[13] Rather, such an untimely assertion is properly classified as a forfeiture. This is because, as the Supreme Court described in *United States v. Olano*, "forfeiture is the failure to make the timely assertion of a right, [while] waiver is the 'intentional relinquishment or abandonment of a known right.'" 507 U.S. 725, 733 (1993) (citations omitted). In the magistrate judge's pretrial order, he specifically identified the sole legal issue in the case as one involving only excessive force, not failure to intervene. This is significant considering "the parties rely on the pretrial conference to inform them precisely what is in controversy [and] the pretrial order . . . establishes the issues to be considered at trial." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443-44 (7th Cir. 1995). In order for a pretrial order to have any value as a procedural mechanism and to protect against the possibility of either of the parties being taken by surprise at trial, the parties must be held to the issues set forth in that order. Therefore, this court has consistently enforced a strict rule of forfeiture in a situation where a party seeks to introduce a new legal theory to the litigation after the pretrial order has issued. *See Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 575 (7th Cir. 1996). As mentioned above, the plaintiffs first asserted their failure to intervene claim after the defendants moved for judgment as a matter of law. At that time the district judge properly refused to allow the defendants to interject this claim, specifically clarifying the sole issue in the case as "dealing with acting, not failure to act."[14] For purposes of this appeal we will

---

[13] Both parties, in their briefs, mischaracterize this issue as one involving waiver. However, because the record is instructive on this issue and because the issue does not ultimately affect the outcome of the case, we have proceeded *sua sponte* and analyze this issue in the proper context of a forfeiture, as discussed *infra*.

[14] Due to the fact that the trial judge interjected and clarified the issues of the case immediately after plaintiffs' counsel advanced

(continued...)

treat this definitive ruling as the denial of a motion to modify the pretrial order under Rule 16 of the Federal Rules of Civil Procedure. *See Gorlikowski*, 52 F.3d at 1445. While it is true that a pretrial order may be modified, such modification is only permissible under very limited circumstances and only in those cases where failure to do so would result in "manifest injustice," Fed. R. Civ. P. 16(e), and we review a district court's refusal to modify a pretrial order only for abuse of discretion. *Gorlikowski*, 52 F.3d at 1444.

Harper and Padilla had numerous opportunities prior to trial to amend their complaint or to petition the court to add a failure to intervene claim to the litigation. As the record establishes, at various times throughout the proceedings as well as in the pretrial order, the trial judge clarified the issues in the trial as only dealing with excessive force and not failure to intervene so as to avoid any confusion for either party. Harper and Padilla offer no reason why the judge's refusal to allow such a claim would constitute "manifest injustice." Instead, they concede that they "intentionally did not bring a separate failure to protect claim." Appellants' Reply Brief at 11. Thus, we hold that the district court did not abuse its discretion in barring the plaintiffs from litigating their failure to intervene claim. *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572 (7th Cir. 2001); *Durr v. Intercounty Title Co. of Illinois*, 14 F.3d 1183, 1187 (7th Cir. 1994). Nonetheless, even if we were to assume *arguendo* that the Harper and Padilla's failure to intervene

---

[14] (...continued)
his novel failure to intervene claim, Harper and Padilla are precluded from claiming that the defendants consented to the trial of this issue. In essence, the trial judge preserved their objection by ruling on what was essentially a motion to amend the pretrial order before any objection could be made. *See generally Camden v. Circuit Court of Second Judicial District*, 892 F.2d 610, 615 (7th Cir. 1989).

claim was not forfeited, the jury's verdict answered and foreclosed this argument entirely for Padilla and for the majority (*i.e.*, from the moment he was taken from the cell he shared with Padilla until he left the strip-search room) of the transport maneuver for Harper.[15]

It is true that this court has recognized in the past that "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so" may be held liable. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)); *see also Fillmore*, 358 F.3d at 505-06. This is what has become known as a "failure to intervene" basis for a constitutional violation under the Eighth Amendment, a principle which this circuit has long recognized. *Fillmore*, 358 F.3d at 506; *Crowder v. Lash*, 687 F.3d 996, 1005 (7th Cir. 1982), *accord Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974). In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation, as we recently articulated in *Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004). In *Fillmore*, a case strikingly similar to the one at bar, the plaintiff, also a prisoner at the Menard Correctional Center, could not succeed on his failure to intervene claim because he had failed to establish that guards used excessive force in violation of his Eighth Amendment rights. *Fillmore*, 358 F.3d 505-06.

Most importantly, like the plaintiff in *Fillmore*, Harper and Padilla have failed to establish an underlying constitutional violation that would allow them to prevail on a failure to intervene claim. *See id.* In special interrogatories submitted by the magistrate judge, the jurors unanimously concluded that: (a) Padilla had not been subjected to excessive force at any time during the transport maneuver; and

---

[15] *See infra* Part II. A. 2.

that (b) no excessive force had been used against Harper from the time he was removed from his cell in the East Cellhouse until he left the strip-search area.[16] Thus, because the jury found that no excessive force was used against Padilla by any guard, at any time, and because an underlying constitutional violation is a primary concern when attempting to establish a failure to intervene claim, Padilla cannot possibly establish joint and several liability and thus his claim that the judge erred in granting the defendants' Rule 50 motion is based on a foundation of quicksand. However, Harper's claim, at least in part, endures and requires that we examine whether he provided sufficient evidence to resist a Rule 50 motion as to the events of August 4, 1996, while he was en route from the strip-search room to his segregation cell in the North Cellhouse.

### 2. Events Not Covered by the Jury's Verdict

Harper's claim must be given separate consideration because the jury's verdict does not cover that specific period of time beginning when Harper left the strip-search area and ending when he arrived at his segregation cell in the North Cellhouse. Harper's specious claim is based on the fact that it is conceivably possible, although most improbable, for him to demonstrate to this court that a reasonable jury could have found that, during that short time period, each and every one of the defendants committed an Eighth Amendment violation against him.

The Eighth Amendment, applicable to the States through the Due Process clause of the Fourteenth Amendment, prohibits "cruel and unusual punishments" and has been interpreted by the United States Supreme Court to encompass the

---

[16] *See supra* pp. 13-14 for the complete text of the special interrogatories.

"unnecessary *and wanton* infliction of pain" upon prisoners in a correctional institution. *Wilson v. Seiter*, 501 U.S. 294, 296 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (emphasis added)). In determining whether a prison official has violated the parameters of this prohibition, part of our task is to "inquire into [the] prison official's state of mind" to determine whether a constitutional violation has occurred; for, "[i]f the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Id.* at 300. In *Wilson v. Seiter*, the Supreme Court explained that, in order for a constitutional violation to exist, plaintiffs in a § 1983 action must establish that prison officials acted wantonly or, stated another way "maliciously and sadistically for the very purpose of causing harm." *Wilson*, 501 U.S. at 296. Indeed, "negligence or even gross negligence is not enough; rather the plaintiffs must show *actual intent* or *deliberate indifference* on the part of state actors in order to make out an eighth amendment claim." *James v. Milwaukee Co.*, 956 F.2d 696, 699 (7th Cir. 1992) (emphasis in original); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2003) (same); *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996). Even objectively serious injuries suffered by prisoners, without the requisite *mens rea* on the part of prison officials, will not comprise a constitutional injury. *See Wilson*, 501 U.S. at 301. In a case such as this, "where prison officials are accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). To illustrate this subjective requirement, there are a number of factors that a court must consider in determining whether excessive physical force has been used such as "the need for an application of force, the relationship between that need and the force applied, the threat reason-

ably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." *Id.* In sum, it is Harper's burden to supply us with a human being or "mind" which we may examine to determine whether specific officers acted "with a knowing willingness that [a constitutional violation would] occur." *Id.*

The problem Harper faces, and has faced throughout the factual and legal presentation of the case, is that he has failed to identify any individual guards that violated his constitutional rights with the use of excessive force at any point during the transfer. More importantly, as to this appeal he has likewise failed to identify any particular officer who harmed him as he was being transferred from the strip-search area to the segregation unit in the North Cellhouse. See *K.F.P. v. Dane County*, 110 F.3d 516, 519 (7th Cir. 1997). In order for courts to satisfy the mandate to inquire into the state of mind of prison officials who have allegedly caused a constitutional violation, see *Wilson*, 501 U.S. at 299, it is most imperative that we are provided with "identified culprits"; for "[w]ithout minds to examine, we cannot conduct an individualized inquiry." *K.P.F.*, 110 F.3d at 519. It was Harper's burden to identify, either through discovery (which was completed to the satisfaction of both parties) or through evidence submitted at trial, those guards that allegedly violated his constitutional rights during the time frame in question; his failure to do so is fatal to the claim and thus it was entirely proper for the district court to grant the defendant's Rule 50 motion.

Indeed, the only guard that Harper established was even present while he was being taken from the strip-search room to the North Cellhouse is Lt. Townley.[17] Townley

---

[17] The plaintiffs claim that the evidence in the record established that, in addition to Lt. Townley, Officer Scott "escorted

(continued...)

stated in part of his testimony at the internal investigation that he "helped escort HARPER to [segregation] Cell #8-42," but that he had "no contact with HARPER or PADILLA." Appendix to Appellant's Brief at A-40. This evidence falls far short of satisfying the mandate of *Wilson v. Seiter* and *Hudson v. McMillian* for establishing an Eighth Amendment violation.[18] Townley's "mere presence" during Harper's transfer from the strip-search area to a segregation cell does not, without more, rise to the level of violation of Harper's constitutional rights, and is not sufficient evidence to withstand a Rule 50 motion. *Fillmore*, 358 F.3d at 506. Furthermore, in his buckshot approach to this litigation Harper has failed to identify *any* particular guard, either in his pleadings or through the evidence submitted to the jury at any point during the trial, that used excessive force against him during his transfer. Thus, absent any evidence or even an allegation which could establish a constitutionally cognizable claim for excessive force against any of the defendants (*e.g.*, identification of the individual guard(s) who used excessive force against him during the transfer procedure) Harper cannot possibly establish bystander liability

---

[17] (...continued)
Mr. Harper from the East Cellhouse to the segregation unit." Appellant's Brief at 17. However, it was reasonable for the trial judge to conclude otherwise in refusing to reconsider his Rule 50 motion, *see supra* pp. 15-16, considering that, even when taken in the light most favorable to Harper, the "Internal Investigation Interview Sheet" falls far short of establishing that Scott escorted Harper to his segregation cell, much less used excessive force in doing so. See Appendix to Appellant's Brief at A-47.

[18] Indeed, the only possible application of *this* evidence would be to establish a failure to intervene claim. However, as we state supra, without establishing an underlying constitutional violation (as the plaintiffs have failed to do) it would be impossible for a failure to intervene claim, as a matter of law, to succeed. *See Fillmore*, 358 F.3d at 505-06.

as to Townley or anyone else for failure to intervene, and his claim must fail. *See id.*; *cf. Miller*, 220 F.3d at 494-96.[19]

---

[19] In *Miller v. Smith*, 220 F.3d 495 (7th Cir. 2000) this court reversed the district court's grant of summary judgment in favor of three police officers accused of using excessive force against a motorist whose van was mistaken for that of a fleeing robbery suspect. In that case, Miller alleged that three officers violated his constitutional rights, one by using excessive force and the other two by failing to intervene. We held that the fact that Miller could not identify the specific officer that beat him was not fatal to his claim because, taking his allegations as true, whichever officer did not directly beat him could be held responsible for failing to intervene.

*Miller* is distinguishable for a number of reasons. First, the plaintiff in *Miller* had a much stronger legal basis for his claim, for he was able to identify, by name, the three officers whom allegedly violated his constitutional rights. What's more, Miller alleged that one of two officers (either Smith or Brower) was the one that actually used excessive force. By process of elimination therefore, the other two (if the constitutional violation were established at trial) could be held responsible for failing to intervene. As we stated in *Miller*, "if [the plaintiff] can show at trial that an officer attacked him while another officer ignored a realistic opportunity to intervene, he can recover." *Miller*, 220 F.3d at 495. However, Harper never identified in his pleadings the particular officer(s) that allegedly violated constitutional rights during his transfer from the strip-search area to his segregation cell. Also, in this case Harper has already had an opportunity to "show at trial" that one of the officers attacked him, but could not. There is no controversy for a jury to decide here; for Harper has simply failed as a matter of law to establish or even allege that any individual officer even touched him while he was being moved, much less violated his constitutional rights. Accordingly there is no basis for a failure to intervene claim either.

Also, it should be noted that the *Miller* case was reviewed before discovery had been completed or trial had begun, where as Harper has been given full discovery as well as their case-in-chief at trial

(continued...)

Without weighing the evidence or making credibility determinations, we have examined the record and drawn all reasonable inferences in Harper's favor as required under Rule 50. However, even in light of this generous standard we hold that Harper has failed to "present a legally sufficient evidentiary basis for a reasonable jury to find" in his favor and thus the trial judge did not commit a reversible error

---

[19] (...continued)
to identify the officer(s) that allegedly used excessive force against him, which he failed to do. Under Rule 50, "where a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue" judgment as a matter of law is proper. Fed. R. Civ. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Although, the method of analysis is essentially identical when reviewing the grant of a motion for summary judgment and when reviewing a grant of a motion under Rule 50, they come at different points in the proceedings. Therefore, the disposition of this case may well have been different if we were reviewing a grant of summary judgment and Harper would still have trial to bear out facts supporting his claim; however, after the presentation of his case-in-chief (or during the entire trial) Harper failed to offer any legal basis for a reasonable jury to find that any constitutional violation had occurred.

Finally, *Miller* is distinguishable from this case for yet another, more fundamental reason. Miller's claim was premised on the Fourth Amendment, and such claims are analyzed under a standard of objective reasonableness. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Thus, Miller was not required, at the summary judgment stage to identify a particular officer who used excessive force as long as he had produced sufficient evidence that one or all of the officers' behavior was objectively unreasonable. However, Harper's claims are premised under the Eighth Amendment which, as noted above, requires that the plaintiff establish subjective intent by identifying a particular "mind to examine." *Wilson*, 501 U.S. at 300; see *supra* pp. 24-26. Harper has failed to do so and therefore his claim must fail.

when granting the defendants' Rule 50 motion dismissing eight of the thirteen defendants. Fed.R.Civ.P. 50(a)(1); *see Sarkes v. Tarzian*, Nos. 03-2994, 03-3098 (7th Cir. Feb. 14, 2005); *Fillmore*, 358 F.3d at 504; *Kossman v. Northeast Illinois Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1036 (7th Cir. 2000).

## B.  *Jury Instructions*

Harper and Padilla also claim that the jury instructions given to the jury by the magistrate judge (concerning the five defendants not dismissed pursuant to Rule 50) erroneously limited their theory of recovery. Specifically, the appellants argue that instruction 18A was "extremely limited" because it allowed the jury to consider only the actions of the remaining five defendants when deciding whether or not to impose liability for the alleged use of excessive force.[20]

---

[20] Instruction 18A states, in pertinent part:

> The plaintiff's complaint consists of two counts. The issues to be decided by you under Count I of the complaint are as follows:

> Plaintiff George Harper claims that he was injured and sustained damage and that defendants Duane Albert, Richard Ferrell, and Todd Scott violated plaintiff's right to be free from cruel and unusual punishment in the following respects:

> Defendants Richard Ferrell and Todd Scott while escorting plaintiff Harper between the East Cellhouse and the North Cellhouse banged and or rammed plaintiff Harper against one or more stationary objects.

> Defendant Duane Albert, in supervising the other members of the tactical unit and allowing with his knowledge and consent those tactical members to punch, kick, beat and ram plaintiff Harper into stationary objects from the time he left cell in the East Cellhouse until the completion of the strip search.

(continued...)

In essence, this is quite simply another attack on the judge's decision to grant the defendants' Rule 50 motion.

We review jury instructions for an abuse of discretion only, and will approve "instructions that fairly and accurately summarize the law and have support in the record." *United States v. Messino*, 382 F.3d 704, 710 (7th Cir. 2004) (quoting *United States v. Jefferson*, 334 F.3d 670, 672 (7th

---

[20] (...continued)

 The plaintiff claims that one or more of the foregoing was a proximate cause of his injuries.

 The defendants deny doing the things claimed by the plaintiff and deny that they acted maliciously and sadistically.

 The defendants further deny that plaintiff was injured or sustained damages to the extent claimed.

 Turning now to Count II of the complaint, the issues to be decided by you under that Count are as follows:

 Plaintiff Robert Padilla claims that he was injured and sustained and damages and that defendants Duane Albert, Tom Lawless and Joseph Edmonds violated plaintiff's right to be free from cruel and unusual punishment in the following respects:

 Defendants Tom Lawless and Joseph Edmonds while escorting plaintiff Padilla between Cell 2-14 in the East Cellhouse and the North Cellhouse banged and or rammed plaintiff Padilla against one or more stationary objects.

 Defendant Duane Albert, in supervising the other members of the tactical unit and allowing with his knowledge and consent those tactical members to punch, kick, beat and ram plaintiff Padilla in stationary objects.

 The plaintiff claims that one or more of the foregoing was a proximate cause of his injuries.

 Defendants deny doing the things claimed by the plaintiff and deny that they acted maliciously and sadistically.

 Defendants further deny that plaintiff was injured or sustained damages to the extent claimed.

Cir. 2003)). In view of the fact that we have previously determined that the magistrate judge did not err when he granted the defendants' Rule 50 motion we are likewise unmoved at what is essentially a collateral attack on that ruling. The plaintiffs' joint and several liability argument lacks a foundation in either fact or law and therefore did not merit submission to the jury. Also, it is worth noting that, as discussed above, the special interrogatories submitted to the jury asked the jurors whether any of the guards used excessive force for the majority of the transfer procedure for both prisoners, to which they unanimously answered "no." In addition, Harper and Padilla waived the specific objection to jury instruction 18A that they raise on appeal because their objection at trial was on another, more confined, basis.[21] *See Shobert v. Ill. Dept. Of Transport*, 304 F.3d 725, 730 (7th Cir. 2002); *Coulter v. Vitale*, 882 F.2d 1286, 1290 (7th Cir. 1989).

## C. *Evidence of Indemnification*

In their final unavailing assignment of error, Harper and Padilla argue that the trial judge erred when he refused to allow them to introduce evidence of the defendants' indemnification by the State of Illinois for acts committed within the scope of their official duties. Evidentiary rulings are

---

[21] At trial Harper and Padilla objected on grounds that the jury instruction did not contain information about specific guards, *i.e.*, that Ferrell and Scott could be potentially held liable for restraining the inmates "in a way that was intended to inflict pain and injury to their wrists." However, on appeal they argue that the instruction should have encompassed a joint and several liability theory. There is no question that these are two substantively separate and distinct grounds for objections and therefore, the argument advanced here is waived. *See Shobert*, 304 F.3d at 730; *Coulter*, 882 F.2d at 1290.

reviewed for abuse of discretion only, and will not be over-turned unless we were to conclude, which we do not, that the judge's ruling was both erroneous and affected the out-come of the case. See *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). However, because the jury found in favor of the defendants and because we have deter-mined that it was not error for the judge to dismiss the other eight defendants, Harper and Padilla were not entitled to any recovery in this case and, thus, the issue of damages has been rendered moot. *See Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 720 (7th Cir. 2004); *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1281 (7th Cir. 1995). Appellants "could not have been prejudiced by the erroneous exclusion of any evidence relating to damages," and therefore there could be no error in precluding evidence relating to the defendants' indemnification status.

### III. Conclusion

The decision of the district court is

AFFIRMED.

FLAUM, *Chief Judge*, concurring in part and concurring in the judgment. While I agree with the result reached by the majority and join much of its reasoning, I write separately to explain one point on which I disagree. As the Court explains, the jury's verdict forecloses all of plaintiffs' claims except those brought by Harper arising between the time he left the strip-search room and when he arrived at his segregation cell. Harper contends that during this last leg

of his transfer, an unidentified officer or officers attacked him. I agree with the conclusion that Harper's inability to point out which officers struck him defeats his excessive force claim because, absent evidence implicating particular defendants, the jury could have imposed liability in this case only by resort to speculation. Moreover, all three judges on this panel are in accord that Harper forfeited his failure to intervene claim by not timely raising it below. This provides a sufficient basis to affirm on all counts.

I respectfully disagree, however, with the majority's alternate holding regarding Harper's failure to intervene claim against Lt. Townley. The Court reaches the merits of this claim and concludes that it too fails as a matter of law because Harper does not know which officers beat him. The majority equates Harper's failure to identify specific culprits with a finding that there was no underlying constitutional violation, and therefore no duty to intervene.

In my view, Harper's inability to pin the excessive force claim on anyone in particular does not preclude the possibility that the attack occurred. To the contrary, given that we are reviewing the grant of judgment as a matter of law, we must accept as true Harper's testimony that, while being moved from the strip-search room to his segregation cell, "officers went out of their way to run him head-first into whatever metal objects they came upon," and that when he arrived at the cell, "one of the larger officers grabbed him by the neck and propelled him into the cell causing him to strike his head on the wall and lose consciousness." *See Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999) ("Judgments as a matter of law are reviewed by appellate courts in the same fashion as summary judgment motions."). If believed, this testimony shows that some officer or officers used excessive force in violation of Harper's Eighth Amendment rights. Moreover, prison records confirm that Lt. Townley helped escort Harper from the strip-search room to the segregation cell. While there is no evidence that

Lt. Townley laid so much as a finger on Harper, the lieuten-
ant would have been duty-bound to attempt to prevent an
attack by his fellow officers if he had reason to know that
excessive force was being used and a realistic opportunity
to prevent it. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.
1994). Harper's testimony combined with prison records
showing that Lt. Townley was present at the time of the
alleged beating establish a jury issue on this claim.

I believe that the majority's reasoning creates at least
some tension with our holding in *Miller v. Smith*, 220 F.3d
491 (7th Cir. 2000). The plaintiff in *Miller* alleged that, after
being mistaken for a fleeing armed felon, he was arrested
by Indiana state troopers, handcuffed, and ordered to lie on
the ground. While he laid there, one of two troopers—the
plaintiff could not say which—kicked him in the back,
stepped on his face, and yanked him around by his hair. *Id.*
at 493. The plaintiff was able to identify specifically a third
officer who looked on but did nothing to stop the attack. He
sued all three officers for excessive use of force and failure
to intervene. The district court granted summary judgment
in favor of the defendants, reasoning that the plaintiff's
inability to identify which officer attacked him precluded
his failure to intervene claims against all of the officers. *Id.*
at 495. We reversed: "If, as we are required to do at this
point in the case, Miller's allegations are taken as true,
whichever officer was not directly responsible for the
beating was idly standing by." *Id.* As in *Miller*, the evidence
viewed in the light most favorable to Harper establishes
that he was brutalized and that an identified law enforce-
ment officer who had a good chance to stop the attack did
nothing. Miller's inability to say who landed the offending
blows did not defeat his failure to intervene claims; Harper's
similar lack of evidence should not be treated any differ-
ently. Nevertheless, because I agree that Harper forfeited
this claim, I join the result reached by the majority.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*