NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted July 7, 2008[*]
Decided July 7, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 07-3249

| | |
|---|---|
| ALLEN PAYETTE, | Appeal from the United States District |
|     *Plaintiff-Appellant,* | Court for the Western District of |
| | Wisconsin |
|     *v.* | |
| | No. 07-C-242 |
| RANDY HOENISCH, et al., | |
|     *Defendants-Appellees.* | John C. Shabaz, |
| | *Judge.* |

**O R D E R**

During his time at Marathon County Jail in Wausau, Wisconsin, Allen Payette was a very difficult inmate. Aside from attempting to destroy jail property, he also repeatedly and seriously attempted to harm himself. Over the course of ten days, Payette had to be transported away from the jail to a hospital three times, first to remove a plastic razor he

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. See FED. R. APP. P. 34(a)(2).

had hidden in his anus, then because he swallowed a staple, and again because he swallowed a piece of metal from his cell sink.  Although jail officials knew that the hospital treating Payette had recommended that he receive mental health treatment, the jail disregarded the recommendation.  Instead, after Payette's last trip to the hospital and until he was transferred to a different facility seven days later, the jail immobilized him in leg, wrist, and waist restraints.  According to Payette, the jail's decision to disregard the hospital's recommendation for mental health care and instead shackle him with painful restraints, caused his mental health to deteriorate further, leading to loss of sleep, recurring nightmares, anxiety attacks, chest pains, and bouts of paranoia, all of which he continues to suffer.

Payette brought this pro se action against several jail employees, alleging several constitutional violations relating to the use of restraints and other conditions of his confinement.  The district court screened Payette's complaint, *see* 28 U.S.C. § 1915A, and allowed him to proceed on his claims under the First and Eighth Amendments.  After some discovery, appellees moved for summary judgment and the district court granted the motion.  Because the district court erred by not considering the evidence submitted by Payette that precludes summary judgment on some of his claims, we affirm in part, vacate in part, and remand.

We begin with a procedural point.  The district court based its ruling only on facts submitted by the appellees, incorrectly believing that Payette "failed to submit any evidence which contradicts the affidavits submitted by the defendants."  While Payette did not follow the usual method of submitting firsthand evidence—that is, filing a separate affidavit—he did assert facts in his complaint and in his response to appellees' motion for summary judgment.  By declaring under penalty of perjury that the complaint and the response were true, Payette "converted" those filings into affidavits; accordingly, the district court should have considered them evidence.  *See Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (response to summary judgment motion); *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996) (complaint).  Appellees defend this part of the district court's ruling by pointing to a district court's discretion to treat one party's proposed facts as undisputed when the other party does not comply with a local rule for motions related to summary judgment. *See, e.g., Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).  But here the district court did not invoke its discretion under local rules, and under similar circumstances, we have refused to second-guess such a decision.  *Jessup v. Luther*, 227 F.3d 993, 999 n.5 (7th Cir. 2000); *McGann v. Northeast Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1178 n.3 (7th Cir. 1993).  In recounting the facts, then, we consider the entire summary judgment record, and as usual, we consider the facts in the light most favorable to the nonmoving party, Payette,

and draw all reasonable inferences in his favor. *See, e.g., Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008).

Payette was housed at Marathon County Jail between March and October of 2006. As we noted, he was a particularly difficult inmate and was subjected to a number of administrative and disciplinary sanctions; he blames his behavior on severe depression that was exacerbated by the conditions of which he complains. Specifically, in June, when jail officials found Payette with a homemade rope made out of bed linens tied around his neck, they moved him to a different cell to better observe him until an evaluation by the jail's mental health provider cleared him as safe to return to his cell. In August, after Payette used a metal nail clipper to carve concrete from the walls in his cell, he was placed in administrative segregation. In September, while still in administrative segregation, Payette and his cellmate used a homemade chisel to carve concrete from the walls in their cell. (Payette later pleaded guilty to criminal damage of property based on this incident.) In response, jail guards placed Payette in a cell with glass windows so that they could observe him better. The next day, Payette broke a telephone in a visitation room and hid pieces of it in his waistband before guards searched him and discovered the pieces. While Payette was out of his cell, jail guards were searching his belongings and found a piece of metal that Payette had broken from a drinking fountain.

In response to Payette's destructive behavior, Jail Administrator Bob Dickman ordered him placed in restraints. A complete description of the restraints is not in the record, but both sides agree they included bindings of the legs, wrists, and waist. Payette reports that the restraints caused him constant pain and made it difficult for him to eat, use the toilet, and sleep. According to appellees, Payette remained in restraints for five days.

Three days after the restraints were removed, Payette began a series of acts of self-mutilation. First, he slashed both his forearms with a sharpened staple. Jail guards considered the wound to be "superficial" and treated it with bandages, but Payette counters that the wound was much worse; he says that he cut his arms open. Second, about a week later, the guards gave Payette a plastic razor for shaving. After about 45 minutes, Payette told guards that he had accidentally flushed the razor down the toilet, but a strip search revealed that he had inserted a piece of the plastic razor in his anus, which required a trip to the hospital for removal. (Payette adds that the guards strip searched him in a cell with a large glass window through which other inmates and guards of both sexes could see him.) Finally, Payette returned to the hospital twice more in the next ten days, once because he said he swallowed a staple and again because he swallowed another piece of metal, this time from the sink in his cell.

During each hospital visit following Payette's self-mutilating acts, doctors consistently recommended that the jail furnish him with mental health treatment. Payette attached the records of these doctors' recommendations to his brief in response to appellees' motion for summary judgment, but because he did not authenticate them and because appellees objected to their use, they are not part of the summary judgment record. *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003). Nevertheless, appellees themselves admit that Jail Administrator Dickman knew about Payette's self-inflicted injuries and knew that the hospital recommended that Payette see a forensic psychiatrist. Dickman did not follow the recommendation. He asserts that he relied on advice that he had earlier received from the jail's health care provider. That advice, which came two months before Payette's repeated attempts at self-mutilation required three trips to the hospital, was that Payette could safely live in his cell.

Disregarding the fresh recommendation for mental health treatment provided after Payette's self-inflicted injuries and hospital visits, Dickman ordered Payette to be placed in restraints for another seven days until he was transferred to a different facility. Payette reports that because he was immobilized by the restraints, he had difficulty sleeping (a situation exacerbated by the painful restraints, by a constantly illuminated light, and by the jail's decision not to allow him a blanket to protect against the cold) and suffered anxiety attacks. During one attack, guards came into his cell, removed his mattress, lifted him two or three feet in the air and dropped him onto the concrete slab that had held the mattress. Payette also reports that after he was placed in the restraints, he began to experience chest pains, bouts of paranoia, sleeplessness, and nightmares.

The district court addressed five of Payette's claims. We take them in turn. First, the court held that Payette's placement in restraints was not cruel and unusual punishment because Payette failed to show that it was done maliciously or sadistically. That is the correct test for excessive force claims brought under the Eighth Amendment, *see Whitley v. Albers*, 475 U.S. 312, 321-22 (1986); *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005), and Payette cannot satisfy it because he failed to produce evidence to rebut appellees' assertions that he was placed in restraints for the legitimate purpose of preventing him from harming jail property or himself.

By contrast, Payette can prove his second claim, that his conditions of confinement were cruel and unusual, without showing malicious intent. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conditions of confinement violate the Eighth Amendment if they deny an inmate the "minimal civilized measure of life's necessities" and prison officials act with "deliberate indifference," to the conditions in question. *Id.* at 834; *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). "Deliberate indifference" means that prison officials know of

and disregard an excessive risk to inmate health and safety. *Farmer*, 511 U.S. at 837. Shackling a prisoner based on a valid penological reason for a short period of time ordinarily does not violate the constitution, *see, e.g.*, *Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999); *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir. 1988), but the seven days that Payette remained in restraints without mental health treatment after the hospital alerted jail officials to his need for such treatment is evidence that jail officials disregarded a significant risk to his health. Indeed, the Eighth Circuit has recognized as clearly established that restraints on a psychiatric patient may be used only under close medical supervision. *Buckley v. Rogerson*, 133 F.3d 1125, 1131 (8th Cir. 1998). Consistent with that holding, regulations requiring close medical supervision of prisoners placed in restraints for more than a brief period of time have been adopted by the American Correctional Association, AMERICAN CORRECTIONAL ASSOCIATION, STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS at 52-53 (4th ed. 2003), the United States Bureau of Prisons, 28 C.F.R. § 552.24(f), and the Wisconsin Department of Corrections, WIS. ADMIN. CODE DOC § 306.11(3)(e). Notably, Wisconsin correctional institutions—Marathon County Jail is not one, though—may not keep an inmate in restraints for more than twelve hours without a psychologist's recommendation. *Id.*

Payette's claim about the restraints is best conceptualized under the heading of deliberate indifference to medical needs. The district court held that there was no evidence that any of the appellees knew that Payette was at risk of serious harm or acted with callous disregard to that risk because Payette received medical treatment following every incident of self-destructive behavior. *See Farmer,* 511 U.S. at 834, 837. But Payette did not receive any *mental health* treatment even though Dickman knew that the hospital recommended it after repeated episodes of self-mutilation. Appellees argue that they were not required to follow the recommendations of the outside doctors because their own doctors had made a different recommendation earlier. Indeed, "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). But the health care provider at the jail who earlier determined that Payette was not at risk did so two months before he slashed his arms, twice swallowed pieces of metal, and inserted part of a plastic razor into his anus, all of which necessitated three hospital visits. By disregarding the fresh advice for mental health treatment prompted by recent shocking behavior, and by using only painful restraints to control a patient for whom mental health treatment was now recommended, jail officials seriously imperiled Payette's mental health. According to Payette, as a result of the jail's conduct, he has suffered from anxiety attacks, chest pains, nightmares, sleeplessness and bouts of paranoia following his release from the jail. On this record, therefore, there is a genuine fact dispute over whether the appellees were deliberately indifferent to Payette's mental health needs.

Payette has another, narrower, claim for deliberate indifference to his medical needs—the medical treatment to his arms after he cut them with a staple—but the district court correctly granted summary judgment on that claim. After Payette used the staple to cut his forearms, he was bandaged by jail staff and not given further medical attention. Payette says that this treatment left him with permanent scars, but he does not suggest that the scars could have been avoided by another treatment that the staff knew about and ignored. To survive summary judgment on this claim, Payette needed to present evidence that a different treatment would have resulted in less scarring, *cf. Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) (plaintiff must provide verified medical evidence to show that a delay in treatment harmed him*)*, and he failed to do that.

The next claim that the district court addressed is Payette's contention that he was denied access to the courts because jail officials denied his requests to speak to his lawyer and would not allow him to have paper and pencil. Payette argues that his inability to communicate with his lawyer "allowed the defendants to continue to put [him] through inhumane conditions." But he is challenging those conditions in court now and does not attest to any harm from the alleged denial of access that would require a remedy greater than any remedy for his conditions-of-confinement claim. Thus, summary judgment on the access-to-courts claim was proper. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (backward-looking access claim must "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought").

Finally, the district court held that Payette was not denied a reasonable opportunity to practice his religion when appellees denied him access to his bible because he failed to allege that "he needed a bible to practice his religious beliefs or what those beliefs were." Putting this reasoning to the side, we affirm the district court's ruling as to Payette's religious-freedom claim, first, because appellees did not target Payette's religious practice; they removed *all* books from his cell because they believed he had previously used a part of a book to create a chisel. Thus, the bible was removed based on a rule of general applicability that did not target religious practice. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). And even if removal of the bible were considered to be an infringement on Payette's freedom to exercise his religion, Payette has not rebutted appellees' explanation that any infringement was reasonably related to legitimate penological interests. See *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Kaufman v. McCaughtry*, 419 F.3d 678, 682-83 (7th Cir. 2005).

Finally, the district court did not address Payette's claim that the way jail guards searched him for the missing plastic razor violated his Fourth and Eighth Amendment rights. At the screening stage, the district court did not mention the Fourth Amendment

claim so we assume it intended to dismiss that claim.  In any event, we have held that prisoner strip-search claims are better addressed under the Eighth Amendment, *see Peckham v. Wisconsin Dept. of Corrections*, 141 F.3d 694, 697 (7th Cir. 1998), and the district court allowed Payette to proceed on his claims under the Eighth Amendment.  Payette's evidence—his verified observation—is that he was strip searched in front of a window in which everyone in the booking department, including inmates and officials of both sexes, could see him.  Payette does not contest the jail's valid penological reason for searching him; he contests the manner of the search.  And his assertions create a triable dispute whether the search was conducted "in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *cf. Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004) (no constitutional violation when strip search was conducted "in a discreet and expeditious manner" in a cell that was out of view of other inmates).

Accordingly, we AFFIRM the district court's grant of summary judgment as to the excessive-force claim, access-to-courts claim, religious-freedom claim, and the claim of deliberate indifference to medical needs regarding the bandaging of Payette's arms. We VACATE the court's grant of summary judgment on the other claims and REMAND for proceedings consistent with this order.